**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Chad Lancaster, | No. CV-25-03200-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| City of Phoenix, et al., | |
| Defendants. | |

Chad Lancaster ("Plaintiff"), a firefighter-paramedic employed by the City of Phoenix, alleges that he has been subjected to unlawful discrimination based on his race (white) and gender (male), as well as to unlawful retaliation, in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964. Plaintiff also asserts a state-law claim for intentional infliction of emotional distress ("IIED").

Now pending before the Court is Defendants' motion to dismiss. (Doc. 8.) For the reasons that follow, the motion is granted in part and denied in part.

## BACKGROUND

I.    Factual Allegations

A.    **The Parties**

Plaintiff is a "firefighter-paramedic who has served the City of Phoenix Fire Department with distinction for nearly twelve years, earning numerous awards and commendations for his service." (Doc. 1-1 at 2.) Plaintiff is "white" and "male." (*Id.* ¶¶ 89, 111.)

The complaint names two defendants.  The first, the City of Phoenix ("the City"), "operates through its employees, agents, and representatives, including the Phoenix Fire Department."  (*Id.* ¶ 3.)  The second, Jason Rideout ("Rideout"), was the Chief of the Phoenix Fire Department.  (*Id.* ¶¶ 5, 6.)

B.     **Plaintiff's Employment History**

On January 7, 2013, "Plaintiff was hired by the Phoenix Fire Department."  (*Id.* ¶ 10.)  Plaintiff "served as a move-up Captain for approximately 10 years and worked as a rover for 11 years."  (*Id.* ¶ 12.)  Plaintiff "currently holds the position of Firefighter Paramedic, ARFF."  (*Id.* ¶ 11.)  Throughout his career with the Phoenix Fire Department, "Plaintiff has never received any disciplinary actions, write-ups, or customer complaints" and has received numerous awards and distinctions.  (*Id.* ¶¶ 13-15.)  Additionally, Plaintiff "was elected Fire Board Chairman from 2015-2020."  (*Id.* ¶ 18.)

C.     **The Challenged Conduct**

1.     2021 Captain Promotion Process

In 2021, Plaintiff participated in the City's captain promotion process ("2021 Captain Promotion Process").  (*Id.* ¶¶ 20-28.)

"In preparation" for that process, "Plaintiff dedicated 18 months to studying and preparing for the examination."  (*Id.* ¶ 20.)  "Plaintiff scored exceptionally well on the written examination (94%) and the tactical examination (92%)."  (*Id.* ¶ 21.)  "Despite his strong performance on the written and tactical portions, Plaintiff was given only 70% on the oral interview portion."  (*Id.* ¶ 22.)

"Plaintiff believes that he performed better than scored" and alleges that the City's "agents purposely lowered his score to place non-White, non-male, and insider candidates ahead of him."  (*Id.* ¶¶ 23-24.)

Plaintiff alleges that, "[a]s a result of the artificially low interview score, [he] was placed at #99 on the 2021 Captain's List."  (*Id.* ¶ 25.)

"Many of Plaintiff's colleagues, including Fire Chief Mike Duran, called the interview board on Plaintiff's behalf to place their support behind the Plaintiff."  (*Id.* ¶ 26.)

- 2 -

Plaintiff alleges that his "interview board was changed at the last minute due to an alleged 'conflict of interest,' resulting in Chiefs Mike Molitor and [Rideout] being placed on the board" and that "[d]espite the alleged conflict of interest concern, Chief Mike Molitor had no conflict interviewing his friend and former subordinate Creston Ludlow, who scored third on the promotional list." (*Id.* ¶¶ 27-28.)

In July 2021, "Assistant Chief Duran . . . contacted Plaintiff stating that he could not get a straight answer from the interview board regarding Plaintiff's low placement, and recommended that Plaintiff meet with [Rideout]." (*Id.* ¶ 29.)

On July 6, 2021, Rideout "made several statements to Plaintiff about his low placement." (*Id.* ¶ 30.)  Specifically, Rideout "told Plaintiff that 'the reason you're not being promoted is because no one had heard your name before,' despite the fact 'that Plaintiff had more Chiefs and Captains call on his behalf than all other candidates combined.'" (*Id.* ¶ 31.)  Rideout "expressed 'doubts' about Plaintiff's resume because it was 'hands down the best they had seen.'" (*Id.* ¶ 32.)

2.    2023 Captain Promotion Process

In 2023, Plaintiff again participated in the City's captain promotion process ("2023 Captain Promotion Process").  (*Id.* ¶¶ 33-38.)

In March 2023, "Plaintiff was forced for a second time onto Chief Molitor['s] and [Rideout]'s interview board, moments before his interview with another board." (*Id.* ¶ 33.) Plaintiff alleges that "[t]his was highly irregular and intentional." (*Id.* ¶ 34.)

"On the 2023 promotional process, Plaintiff scored: Written 86%, Tactical 78%, and Interview 80%." (*Id.* ¶ 35.)  Plaintiff believes his "Tactical and interview scores were altered." (*Id.*)

In July 2023, "Plaintiff's placement on the certified Captain's List was changed twice, in one week, after the list has been published and certified by City HR." (*Id.* ¶ 36.) The list was changed "[f]irst from 63 to 65; and then from 65 to 67." (*Id.* ¶ 37.)  "Although the captain promotional process ended in the first few days of May 2023, the 'certified' list was not released until July 2023.  City HR was still making changes to score for the written

exam (held in March) after the list was certified in July." (*Id.* ¶ 38.)

### 3. Recorded Admissions

On July 18, 2023, "Plaintiff recorded a conversation with [Rideout] in which Rideout made explicit admissions regarding the use of racial factors in promotional processes." (*Id.* ¶ 39.) "When asked about DEI, gender and race as factors being used in the promotional process, [Rideout] confirmed: 'Yes, [i]t's not a rumor.'" (*Id.* ¶ 40.) Rideout "explained that minorities and women get extra points, but HR/City does that, not the department. 'I forgot, they have a term for it, that would say how many white males took the test, how many females took the test, how many black dudes took the test, how many Asians, how many Mexicans, all that kind of stuff. And they have a factor (The City) that goes, that ties it into that.'" (*Id.* ¶ 41.)

Rideout also "confirmed that racial adjustments were made to scores" and "revealed that five factors were used in final scoring: written score, tactical score, oral score, seniority, and racial/gender factors." (*Id.* ¶¶ 42-43.) Rideout additionally "told another firefighter, Joe Nonno, 'the reason you are not being promoted is because you are a white guy.'" (*Id.* ¶ 44.)

### 4. List Manipulation

On July 18, 2023, Rideout showed Plaintiff two pieces of paper. (*Id.* ¶ 45.) Rideout "point[ed] to the middle of the first page and stat[ed] that Plaintiff was 'right there on the list, surrounded by guys that will be promoted,' and claimed he had no control over where Plaintiff was moved after the list left their hands." (*Id.*)

On July 20, 2023, "Chief Russ Kirk showed Plaintiff a different list that he stated he 'was not supposed to be sent' and that Plaintiff was 'sure not supposed to ever see it.'" (*Id.* ¶ 46.) "This second list showed the Plaintiff was moved to third from the bottom of all interview scores (3rd worst out of all candidates), directly contradicting [Rideout]'s claim that Plaintiff was in the middle of the first page." (*Id.* ¶ 47.)

### 5. Meeting With City HR

On October 6, 2023, Plaintiff met with City HR representative Megan Avalos

("Avalos").  (*Id.* ¶ 49.)

During the meeting, Avalos "admitted that fire administration held onto the list for four plus weeks after the last interview was completed, even though City/HR repeatedly contacted fire administration and requested the list."  (*Id.*)  Avalos "stated that she suspected that scores were being changed and people being moved on the list during this time" and that "she and City HR were aware the interview questions were leaked."  (*Id.* ¶ 51.)  Avalos further "acknowledged the existence of discriminatory and retaliatory cultures in both the Phoenix Police and Fire departments."  (*Id.* ¶ 52.)  Plaintiff made Avalos aware that "there was a fear of being assaulted at work or violence towards him on the fire ground, if it was made aware he came forward to City HR."  (*Id.* ¶ 55.)

Avalos requested Plaintiff "send her an email with both Captains' Lists from 2021 and 2023."  (*Id.* ¶ 54.)  That same day, Plaintiff sent Avalos the requested lists.  (*Id.*)  It took Avalos "almost 3 weeks to return correspondence," and she stated "she had been busy 'but would dig into this later this week.'"  (*Id.* ¶ 56.)  Avalos, however, "never contacted the Plaintiff again."  (*Id.* ¶ 57.)

### 6. Union Obfuscation

On July 7, 2023, "Union President Bryan Willingham refused to allow Plaintiff to grieve his scoring issues, stating 'what am I supposed to do, go to the city and say one of my guy's feelings are hurt?'"  (*Id.* ¶ 58.)  "Mr. Willingham threatened Plaintiff, stating that 'if you have a list scrapped, good luck with that out there.'"  (*Id.* ¶ 59.)

On October 27, 2023, "Willingham called Plaintiff and berated him, stating he would never promote Plaintiff if he was on his board because Plaintiff was uneducated, did not know how to speak and rambled."  (*Id.* ¶ 60.)  "Mr. Willingham is the President of Local 493, and this organization is a non-punitive organization against its members, even though he went to the Fire Chief and HR Chief Paul Moore and attempted to get management to interfere in a union election and get the Plaintiff disciplined."  (*Id.*)

On June 21, 2024, "Union Trustees Chris Murphy and Keith Rogers conducted a 'Union Blitz' in front of sixteen plus co-workers at Station 19, calling Plaintiff a 'fucking

asshole' and falsely stating he was offered and declined a union position." (*Id.* ¶ 61.)

On December 10 and 11, 2024, "Chris Murphy was calling fire stations in Phoenix and telling the crews to watch the Senate Hearing featuring the Plaintiff and other witnesses. Chris Murphy gave out the link to watch the hearing remotely. Chris Murphy was sent by the Union to disparage Plaintiff publicly at the Arizona State Capitol Committee Hearing in a call to the public." (*Id.* ¶ 62.) Plaintiff further alleges that "Arizona State Senator Jake Hoffman informed Plaintiff that his Union had sent questions and information to other Senate staff to humiliate and discredit Plaintiff and other firefighters that were scheduled to speak on the discriminatory practices at the Phoenix Fire Department." (*Id.* ¶ 63.)

### 7. Hostile Work Environment

On July 21, 2024, Captain Chris Murphy "told Plaintiff he was 'The Station Captain' and could have Plaintiff removed from the airport at any time, threatened Plaintiff, and told him he will not stop using Plaintiff's name in public union meetings, because if he says what he says to the Plaintiffs face, he can say statements publicly." (*Id.* ¶ 65.)

On August 16, 2024, "Battalion Chief Rustin Eikleberry made derogatory and false statements about the Plaintiff's discrimination claim and his intentions at Station 41 in front of ten co-workers at dinner." (*Id.* ¶ 66.)

On December 27, 2024, Captain Murphy "used his access to Telestaff scheduling software to move firefighters around, moving his 'buddies' into better positions while disadvantaging Plaintiff." (*Id.* ¶ 67.)

"From 2023 through 2025, Plaintiff repeatedly contacted South Deputy, Battalion Chief Teddy Fourlis, requesting not to be sent to the airport due to the hostile work environment created by Mr. Murphy and others." (*Id.* ¶ 68.)

### 8. Retaliatory Conduct

On March 3, 2024, "Captain Mike Maciel asked Plaintiff if he was going to bring the department down with a lawsuit because a Chief had confided in him about Plaintiff's Attorney General complaint, which had not been made public." (*Id.* ¶ 69.)

On April 14 and 17, 2024, "Plaintiff was denied water tanker/tender qualification despite completing and passing the training on his off-duty days, unpaid, and in uniform, while all other firefighters present received their qualifications." (*Id.* ¶ 70.)

On May 3, 2024, "Plaintiff was forced out of his position at Station 19 (ARFF program) through the abnormal listing of his position as a temporary vacancy, but allowing a captain to move shifts to displace Plaintiff." (*Id.* ¶ 71.)

On July 23, 2024, "Plaintiff was offered a Firefighter Paramedic B Shift position for which he had seniority, but the offer was rescinded in the same phone call due to a 'personal interpretation of policy.'" (*Id.* ¶ 72.)

On September 28, 2024, "Chief Molitor slammed the phone down and hung up on Plaintiff who had called South Deputy to get his assignment for the day. Chief Molitor saw the Plaintiff's supervisor, Captain Phil Johnson, and told him . . . he did not get hung up on, 'that they are just too busy to say goodbye at South Deputy.'" (*Id.* ¶ 75.)

II.   Procedural History

On February 12, 2024, "Plaintiff filed a complaint with the Arizona Attorney General's Office for discrimination and retaliation."[1] (Doc. 10 at 4.) "The Arizona Civil Rights Division dismissed Plaintiff's complaint." (Doc. 1-1 ¶ 79.)

On September 3, 2024, Plaintiff filed an EEOC charge. (*Id.* ¶ 78.) On April 30, 2025, Plaintiff received a right-to-sue letter. (*Id.* ¶ 80.)

On July 28, 2025, Plaintiff filed suit in Maricopa County Superior Court. (Doc. 1-1 at 2.) The complaint asserts six claims: (1) race discrimination in violation of 42 U.S.C. § 1981; (2) liability under *Monell* based on race discrimination (against Rideout only); (3) race discrimination in violation of Title VII; (4) sex discrimination in violation of Title VII; (5) retaliation in violation of Title VII; and (6) IIED.[2]

---

[1]   In his response brief, Plaintiff clarifies that although he "inadvertently alleged he filed his complaint in January 2024 in the Complaint," he actually filed his complaint with the Arizona Attorney General's Office on February 12, 2024. (Doc. 10 at 4 & n.1.)

[2]   The complaint mistakenly labels both the second and third claim as "Count Two." (Doc. 1-1 at 12-13.) For purposes of this order, the Court will refer to the second claim as "Count Two-*Monell*" and the third claim as "Count Two-Title VII."

On September 2, 2025, Defendants removed this action to federal court.  (Doc. 1.)

On September 23, 2025, Defendants filed the pending motion to dismiss.  (Doc. 8.) That motion is now fully briefed.  (Docs. 10, 11.)[3]

**DISCUSSION**

I.    Legal Standard

Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (cleaned up).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party."  *Id.* at 1444-45 (citation omitted).  However, the court need not accept legal conclusions couched as factual allegations.  *Iqbal*, 556 U.S. at 678-80.  Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 678.  The court also may dismiss due to "a lack of a cognizable legal theory."  *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

II.    Time-Barred Allegations

A.    **The Parties' Arguments**

Defendants argue that "[v]arious allegations in the Complaint must be stricken because they are barred by the statutes of limitations."  (Doc. 8 at 5.)  As for Count One, Defendants argue that Plaintiff "cannot rely on allegations from the 2021 Captain Promotion Process" because "[a] claim filed pursuant to 42 U.S.C. § 1981 is subject to a four-year statute of limitations" and "Plaintiff filed his Complaint on July 28, 2025, so the allegations regarding the 2021 Captain Promotion Process (which occurred prior to July

---

[3]    Defendants' request for oral argument is denied because the issues are fully briefed and oral argument will not aid the decisional process. See LRCiv 7.2(f).

2021) must be stricken from Count One." (*Id.*) As for Count Two-*Monell*, Defendants argue that it "is subject to the two-year statute of limitations set forth in the state's personal injury statute of limitations," so "[a]ny allegations . . . in Count Two-*Monell* regarding events prior to July 28, 2023 are barred. Thus, Plaintiff cannot allege facts regarding the 2021 Captain Promotion Process, communications in 2021, and the 2023 Captain Promotion Process (including Plaintiff's 'evidence of list manipulation') to support his *Monell* claim because all of these events occurred prior to July 28, 2023." (*Id.* at 6.) As for Count Two-Title VII, Count Three, and Count Four, which are all brought under Title VII, Defendants argue that such claims "must be filed with either the Equal Employment Opportunity Commission ('EEOC') within 180 days, or with the Arizona Civil Rights Division ('ARCD') within 300 days of the alleged unlawful employment practice" and because "Plaintiff first filed a complaint with the Arizona Attorney General's Office in January 2024 . . . to be timely, Plaintiff's Title VII claims . . . must have accrued within 300 days prior to January 2024, which bars any allegations prior to March 2023." (*Id.*) Thus, "Plaintiff's Title VII claims regarding the 2021 Captain Promotion Process and all subsequent communications regarding that process are barred by the statute of limitations." (*Id.*) As for Count Five, Defendants argue that an IIED clam "brought against a public entity in Arizona must be filed within one year," so "any allegations in Count Five encompassing events that occurred prior to July 28, 2024 must be stricken." (*Id.* at 7.) In sum, Defendants argue that "[e]ach count is subject to the following limitations periods: Count One cannot be supported by allegations prior to July 28, 2021; Count Two-*Monell* cannot be supported by allegations prior to July 28, 2023; Counts Two-Title VII, Three, and Four cannot be supported by allegations prior to March 2023; and Count Five cannot be supported by allegations prior to July 28, 2024." (*Id.*)

In response, Plaintiff does not dispute that the allegations outlined by Defendants are untimely but argues the Court should still deny Defendants' request to strike "'all factual allegations from 2021 . . . from the Complaint,' for several reasons: (i) the Motion does not identify any statute or rule that authorizes the requested strike, as required by

LR[C]iv 7.2(m)(1); (ii) the untimely allegations provide relevant background evidence in support of Plaintiff's timely discrimination claims and are directly related to Plaintiff's retaliation claim; and (iii) Defendants have not shown that the untimely allegations constitute prejudice." (Doc. 10 at 7-8, citation omitted.) Citing *Lyons v. England*, 307 F.3d 1092 (9th Cir. 2002), Plaintiff argues that "untimely evidence of the employer's discriminatory acts may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue." (*Id.*, cleaned up.) Plaintiff argues that "[h]ere, all of the untimely allegations that Defendants seek to have stricken give rise to an inference of unlawful discrimination *when combined with the timely allegations*. Plaintiff's allegations regarding the 2021 Captain Promotion Process clearly relate to the allegations regarding the 2023 Captain Promotion Process insofar as both processes involved alleged list manipulation and the alleged use of racial/gender factors in determining promotions. Plaintiff is thus allowed to use the untimely allegations as indirect proof of the City's intent to discriminate." (*Id.*) Plaintiff additionally argues that his "protected activity in October 2023 involved a complaint to HR regarding *both* the 2021 and 2023 Captain Promotion Process. Thus, the allegations regarding the 2021 Captain Promotion Process are directly related to Plaintiff's retaliation claim." (*Id.*)

In reply, Defendants argue that "Plaintiff admits that the allegations regarding the 2021 Captain Promotion Process are in fact untimely." (Doc. 11 at 3.) Defendants argue that "Plaintiff does not oppose, and so must agree, that each remaining count is subject to the following limitations periods: Count One cannot be supported by allegations prior to July 28, 2021, and Counts Two[-]Title VII, Three, and Four cannot be supported by allegations prior to March 2023." (*Id.*) Defendants exclude Count Two-*Monell* and Count Five from this calculus because, as detailed below, Defendants argue that "Plaintiff has abandoned these claims." (*Id.* at 3 n.2.) As for Plaintiff's argument regarding LRCiv 7.2(m)(1), Defendants argue that Fed. R. Civ. P. 12(f) "authorizes the Court to strike from a pleading 'any redundant, immaterial, impertinent, or scandalous matter.'" (*Id.* at 4.) Defendants argue that "[u]ntimely allegations are both impertinent and immaterial because

they cannot be relied upon to support Plaintiff's claims." (*Id.*) Defendants also argue that "the untimely allegations must be stricken because they are prohibited by the respective statutes of limitations for each claim." (*Id.*) As for Plaintiff's argument that untimely allegations may serve as background evidence, Defendants argue that "[l]ike in *Lyons*, Plaintiff also cannot 'sustain a cause of action for relief from present injury caused by time-barred acts of discrimination.'" (*Id.* at 4-5, citing *Lyons*, 307 F.3d at 1112.) Defendants argue that "[t]he key difference between the evidence that the Ninth Circuit identified in *Lyons* and the allegations offered by Plaintiff here is that the allowed 'background' evidence in *Lyons* was limited to policy and statistical evidence, while Plaintiff's allegations here relate to discrete acts of alleged discrimination." (*Id.* at 5.) Defendants further argue that "[n]ot only are Plaintiff's untimely allegations unrelated to any policy or statistical evidence, but Plaintiff's claims are also based on discrete acts of alleged discrimination"—the 2021 Captain Promotion Process and the 2023 Captain Promotion Process—yet "Plaintiff alleges absolutely no discrimination occurring in the year 2022 between these discrete Promotion Processes. Thus, these two occurrences are distinct, and untimely allegations occurring prior to the limitations period . . . should not be relied upon even as 'background evidence.'" (*Id.* at 6.) Finally, Defendants argue that they "are not required to make a showing of prejudice to strike untimely allegations either under Fed. R. Civ. P. 12(f) or Local Rule 7.2. . . . However, Defendants do face significant prejudice if these allegations are not stricken, including increased discovery costs, confusion of the issues to be actually litigated, and substantial increased use of this Court's time and resources for facts that cannot support Plaintiff's claims." (*Id.*)

B.     **Analysis**

The parties agree, based on their shared understanding of the applicable statutes of limitations, that any claim premised on conduct occurring before the following dates is time-barred: Count One—July 28, 2021; Count Two-*Monell*—July 28, 2023; Counts Two-Title VII, Three, and Four—April 18, 2023;[4] and Count Five—July 28, 2024. The dispute

---

[4]     Although Defendants argue that "Counts Two-Title VII, Three, and Four cannot be supported by allegations prior to March 2023" (Doc. 8 at 7), Defendants' calculation is

turns on whether Plaintiff may nevertheless rely on such untimely conduct to provide background evidence in support of his remaining, timely allegations.

Plaintiff is correct that he may rely on the untimely allegations for background purposes. "So long as those allegations can be construed as 'background evidence,' and that construction is favorable to Plaintiff, their presence may assist Plaintiff in staving off a Rule 12(b)(6)-based dismissal attempt." *Bond v. Wells Fargo Bank NA*, 782 F. Supp. 3d 743, 755 (D. Ariz. 2025). Moreover, "any potential for mischief posed by the presence of those allegations is mitigated by Plaintiff's concession in [his] response brief that [his] complaint is only intended to state a claim for discrimination based on discrete acts of discrimination that were timely included in [the complaint]." *Id.* Thus, Plaintiff is permitted to plead time-barred discriminatory acts as background evidence.

There is no merit to Defendants' argument that the untimely allegations must be stricken because "the allowed 'background' evidence in *Lyons* was limited to policy and statistical evidence, while Plaintiff's allegations here relate to discrete acts of alleged discrimination." (Doc. 11 at 5.) Although Defendants are correct that the background evidence in *Lyons* related to policy and statistical evidence, *Lyons* does not hold or suggest that those are the only permissible categories of background evidence. *Lyons* holds that "'relevant evidence' is defined by Rule 401 of the Federal Rules of Evidence as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. In the context of a racial disparate treatment claim, admissible background evidence must be relevant to determine the ultimate question: whether . . . the defendant intentionally discriminated against the plaintiff because of his race." *Lyons*, 307 F.3d at 1110 (cleaned up). As a result, courts in the Ninth Circuit allow plaintiffs to include "background evidence" that goes beyond policy and statistical evidence. *See, e.g.*, *Bond*,

---

based on the allegation in the complaint that Plaintiff's charge with the Arizona Attorney General's Office was filed in January 2024. (Doc. 1-1 ¶ 76.) But as noted above, Plaintiff's opposition brief clarifies that the charge was filed on February 12, 2024. (Doc. 10 at 4.) Thus, the relevant cutoff date (after subtracting 300 days) is April 18, 2023 rather than March 2023.

782 F. Supp. 3d at 753-55 (permitting "other discrete discriminatory acts that occurred more than 300 days before Plaintiff filed the Final Charge" to "serve as background evidence"); *Walsh v. J.B. Hunt Transp. Inc.*, 2023 WL 1800962, *4 (D. Ariz. 2023) ("Plaintiff's allegations related to the August 2019 corporate training session, Defendant Adams' unannounced visit to Plaintiff's house in November 2020, Plaintiff's recovery from COVID-19 in December 2020, or any other allegations that occurred prior to June 29, 2021 . . . may still be included in the Complaint to the extent they serve as 'background evidence' in support of a timely claim for actionable discrimination."); *Brodus v. Mar. Inn & Air Force Servs. Agency*, 2022 WL 2286476, *11 (C.D. Cal. 2022) ("Even assuming that certain of the allegations in the TAC concern matters that could not be advanced because the claims are not timely, the allegations could still constitute prior acts of discrimination that can be used 'as background evidence to support a timely claim.'") (citation omitted); *Griggs v. Sacramento City Unified Sch. Dist.*, 2021 WL 1614405, *6 (E.D. Cal. 2021) ("[Plaintiff]'s allegations about Caucasian male comparators provide relevant background and may have a 'possible bearing on the subject matter of the litigation.' The motion to strike paragraph eight is denied.") (citation omitted); *Martinez Patterson v. AT&T Servs. Inc.*, 2019 WL 5294532, *4 (W.D. Wash. 2019) ("[E]ven though Uday Shah's failure to promote Plaintiff occurred outside the statute of limitations period, a plaintiff may still use an employer's time-barred discriminatory act as background evidence in support of her timely claims."). The Court will thus permit Plaintiff to use the untimely allegations as background evidence, "but will proceed with the understanding that they do not purport to set forth claims." *Bond*, 782 F. Supp. 3d at 755.

Defendants' references to Rule 12(f) do not compel a different conclusion. True, under Rule 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." But the challenged allegations here are not redundant, immaterial, impertinent, or scandalous—instead, they provide background evidence that may support Plaintiff's timely claims. *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010) (an allegation is "not immaterial" if it

"relates directly to the plaintiff's underlying claim for relief" and is "not impertinent" if it "pertains directly to the harm being alleged"). *See also De Markoff v. Superior Ct. of Cal.*, 2013 WL 1896259, *5 (E.D. Cal. 2013) ("While it is true that the injuries occurring beyond the limitations period are not actionable, . . . the statute of limitations does not bar an employee from using prior acts as background evidence in support of a timely claim. Here, Defendant seeks to have this court strike evidence of discrete acts beyond the limitation period. The acts beyond the limitations period are not actionable but neither are they redundant, immaterial, impertinent, or scandalous material warranting striking pursuant to Fed. Rule Civ. Proc. 12(f).").

In a related vein, there is no merit to Defendants' request to strike "paragraphs 58 to 63 of the Complaint under the heading Union Obfuscation because these allegations are immaterial to Plaintiff's claim against defendants." (Doc. 8 at 13 n.4.) Specifically, Defendants argue that "conduct by the Union and its representatives cannot be imputed onto the City" and that "[t]hese allegations have nothing to do with Plaintiff's claims against either Defendant because the Union does not act on behalf of the City." (*Id.*)

To succeed on a Rule 12(f) motion to strike, the movant must generally show "that the allegations being challenged are so unrelated to the plaintiff's claims as to be unworthy of any consideration as a defense and that their presence in the pleading throughout the proceeding will be prejudicial to the moving party." Wright & Miller, 5C Fed. Prac. and Proc. § 1380 (3d ed., updated Nov. 2025). *See also XY Skin Care & Cosms., LLC v. Hugo Boss USA, Inc.*, 2009 WL 2382998, *1 (D. Ariz. 2009) ("[A] Rule 12(f) movant not only must demonstrate the allegedly offending material is redundant, immaterial, impertinent, or scandalous, or constitutes an insufficient defense, but must also show how such material will cause prejudice. . . . Any doubt concerning the redundancy, immateriality, impertinence, scandalousness or insufficiency of all or part of a pleading must be resolved in favor of the non-movant."). Defendants have failed to demonstrate how they will suffer prejudice if the challenged allegations—which, by their own account, relate to a non-party that is not empowered to act on their behalf—remain in the complaint. Moreover, at least

at this early stage of the proceedings, the Court is not convinced that the challenged allegations have no possible bearing on the subject of the suit.

III.    Count One (§ 1981 Claim Against The City)

The introductory paragraph of Defendants' motion states that Count One should be dismissed "in its entirety." (Doc. 8 at 1.)  However, Defendants do not repeat this argument (or make any attempt to develop it) in the body of their motion.

In response, Plaintiff argues that he "has sufficiently pled a timely § 1981 claim because Plaintiff alleged discriminatory acts based on race within the four-year statute of limitations." (Doc. 10 at 6.)  Plaintiff argues that "[a]s Defendants note, allegations of race discrimination that occurred on or after July 28, 2021, are timely for purposes of Plaintiff's § 1981 claim." (*Id.*)  Plaintiff further argues that Defendants' "request completely ignores the numerous remaining timely allegations supporting Plaintiff's § 1981 claim." (*Id.* at 7.)

In reply, Defendants only argue that "Count One cannot be supported by allegations prior to July 28, 2021, pursuant to the statute of limitations.  As such, Plaintiff's Count One must be dismissed where it relies on untimely allegations." (Doc. 11 at 6-7.)

Defendants have failed to establish that Count One should be dismissed in its entirety (and it is not clear, based on Defendants' briefing, whether Defendants are even requesting such an outright dismissal).  Moreover, as discussed above, Plaintiff may rely on untimely allegations as background evidence in support of his § 1981 claim.  Thus, Defendants' motion to dismiss Count One is denied.

IV.    Count Two (*Monell* Claim Against Rideout)

A.    **The Parties' Arguments**

Defendants argue that Count Two-*Monell* should be dismissed because "(1) it is asserted against an individual instead of a municipality, and (2) Plaintiff does not allege a violation of a constitutional right." (Doc. 8 at 7.)  As for the first point, Defendants elaborate that "[Rideout] cannot be held liable in his individual capacity as alleged in Count Two-*Monell* because *Monell* claims only are asserted to hold municipalities liable for the actions of individuals, not to hold individuals liable for municipalities' actions." (*Id.* at 8.)

Defendants argue that "Plaintiff alleges that [Rideout] was a policymaker who oversaw promotions for the City of Phoenix Fire Department.  However, this is not a sufficient basis to hold Mr. Rideout liable under *Monell* because he is not the municipality.  Therefore, Plaintiff's *Monell* claim must fail and be dismissed with prejudice." (*Id.*, citation omitted.)  As for the second point, Defendants contend that "the statute of limitations for *Monell* claims in this case is two years," so "the allegations Plaintiff may use to support his *Monell* claim do not include the 2021 or 2023 Captain Promotion Processes, since both occurred prior to July 28, 2023." (*Id.* at 9.)  Defendants argue that "[e]ven if the Court considers the alleged events that occurred prior to the limitations period, Plaintiff still fails to allege any underlying constitutional violation. . . .  Plaintiff merely alleges that the promotion policies disadvantaged him because he is white and male, and that consideration of race and gender prevented him from being selected for a promotion.  Even taking these alleged facts at their face value, they do not rise to the level of a constitutional violation." (*Id.* at 9, citation omitted.)  Defendants also argue that "[i]f the Title VII claims in Count Two-Title VII, Count Three and Count Four are asserted against [Rideout], they must be dismissed because individual supervisors cannot be held liable for Title VII violations," and "if the IIED claim in Count Five is asserted against [Rideout], it should be dismissed for failure to state a claim." (*Id.* at 7-8.)  Defendants argue that "[a]lthough Plaintiff has only named [Rideout] in the *Monell* claim, Plaintiff should be barred from amending the Complaint to name [Rideout] as a defendant in any other claims." (*Id.* at 10.)

Plaintiff makes no arguments in response.  (*See generally* Doc. 10.)

In reply, Defendants argue that "the Court may construe the plaintiff's failure to respond as consent to granting the motion."  (Doc. 11 at 2.)  Defendants argue that Plaintiff's response "makes no mention of his Count Two-*Monell* claim or any other theory of liability against [Rideout] in his individual capacity.  Plaintiff's Count Two-*Monell* was the only claim alleged against [Rideout], so dismissal of that claim also requires dismissal of [Rideout] as a party." (*Id.* at 2-3.)

…

B.      **Analysis**

Although Count Two-*Monell* could be dismissed for an array of reasons, the most fundamental problem—which Plaintiff failed to address in his response—is that it is only asserted against Rideout in his individual capacity and is not asserted against the City.  To be clear, it is possible to assert a § 1983 claim against a supervisor in his individual capacity.  *See generally Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) ("A defendant may be held liable as a supervisor under § 1983 if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.  A plaintiff must show the supervisor breached a duty to plaintiff which was the proximate cause of the injury.  The law clearly allows actions against supervisors under section 1983 as long as a sufficient causal connection is present and the plaintiff was deprived under color of law of a federally secured right.") (cleaned up).  But such a claim is different from a *Monell* claim, which is a mechanism for suing a municipal defendant.  A municipal employee's conduct may "constitute[] an *element* of a *Monell* claim," but "*Monell* liability is limited to the 'acts of the municipality.'"  *Lockett v. Cnty. of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)).  *See also Guillory v. Orange Cnty.*, 731 F.2d 1379, 1382 (9th Cir. 1984) ("*Monell* does not concern liability of individuals acting under color of state law.").  Thus, Plaintiff's attempt to assert a *Monell* claim solely against Rideout in his individual capacity must fail.  *See, e.g.*, *Reason v. City of Richmond*, 2021 WL 107225, *5 (E.D. Cal. 2021) ("Plaintiffs attempt to sue Chief Williams and Chief French in their individual capacities under *Monell*, but a *Monell* claim may be brought only against a municipality, not an individual."); *Tingirides v. Cal. Dept. of Corr. & Rehab.*, 2020 WL 4904661, *10 (C.D. Cal. 2020) ("Defendants are correct that Defendant Borders cannot be liable under a *Monell* theory of liability. . . .  The *Monell* doctrine does not apply to Defendant Borders, a state official, sued in his individual capacity."); *Mendez v. Becher*, 2012 WL 12920630, *1 (N.D. Cal. 2012) ("Plaintiff's third cause of action is predicated on liability established under *Monell* . . . , which provides for

- 17 -

municipal liability where there is a custom or policy causing the harm to plaintiffs. It does not establish individual liability such as that of Chief Becher in her individual capacity.").

V. Count Five (IIED Claim Against The City)

A. **The Parties' Arguments**

Defendants argue that Count Five "must be dismissed because Plaintiff cannot satisfy the required elements of the claim." (Doc. 8 at 11.) Defendants argue that "[t]o state a cognizable claim of IIED under Arizona law, a plaintiff must prove three required elements: first, the conduct by the defendant must be extreme and outrageous; second, the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct; and third, severe emotional distress must indeed occur as a result of the defendant's conduct." (*Id.*, cleaned up.) Defendants argue that Count Five fails to satisfy the first and second elements because "(1) [Plaintiff] has not alleged any extreme and outrageous conduct by the City, and (2) [Plaintiff] has not alleged that [the City]'s actions purposely or recklessly caused his emotional distress." (*Id.*) As for the first element, Defendants elaborate that the statute of limitations confines Count Five "to facts occurring after July 28, 2024" and "there are almost no allegations in the Complaint that support Plaintiff's IIED claim against either Defendant." (*Id.* at 11-12.) Citing *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*, 905 P.2d 559 (Ariz. Ct. App. 1995), Defendants argue that a failure to give a work promotion "'does not go beyond all possible bounds of decency, even if it was motivated by sex discrimination or retaliation" and that "'it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of [IIED].'" (*Id.* at 12.) Defendants add that "Plaintiff's claims of retaliation do not rise to the level of outrageousness either." (*Id.* at 12-13.) As for the second element, Defendants elaborate that "Plaintiff has not alleged facts to show that the Defendants acted purposefully or recklessly in supposedly causing his extreme emotion distress." (*Id.* at 13.)

Plaintiff makes no arguments in response. (*See generally* Doc. 10.)

In reply, Defendants argue that "[b]ecause Plaintiff has not opposed dismissal of

Count Five . . . he agrees to dismiss [it]." (Doc. 11 at 3.)

### B.    Analysis

Under Arizona law, an IIED claim has three elements: "First, the conduct by the defendant must be extreme and outrageous; second, the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct; and third, severe emotional distress must indeed occur as a result of defendant's conduct." *Citizen Publ'g Co. v. Miller*, 115 P.3d 107, 110 (Ariz. 2005) (cleaned up).

"A trial court is to act as a gatekeeper to determine whether the alleged actions are 'so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Morgan v. Freightliner of Arizona, LLC*, 2017 WL 2423491, *8 (D. Ariz. 2017) (quoting *Mintz*, 905 P.2d at 563). "[T]he Court need not determine whether Defendants' conduct was outrageous enough to create liability, only whether reasonable persons could differ as to whether the conduct is 'extreme and outrageous.'" *Id.* "[C]onduct necessary to sustain an intentional infliction claim falls at the very extreme edge of the spectrum of possible conduct." *Reel Precision, Inc. v. FedEx Ground Package Sys., Inc.*, 2016 WL 4194533, *2 (D. Ariz. 2016) (quoting *Watts v. Golden Age Nursing Home*, 619 P.2d 1032, 1035 (Ariz. 1980)). "It 'must completely violate human dignity. The conduct must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.'" *Id.* (quoting *Pankratz v. Willis*, 744 P.2d 1182, 1189 (Ariz. Ct. App. 1987)). Additionally, Arizona courts have held that "[i]t is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Mintz*, 905 P.2d at 563 (quoting *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988)). *See also id.* ("We readily agree with the trial court that Bell Atlantic's failure to promote Mintz does not 'go beyond all possible bounds of decency,' even if it was motivated by sex discrimination or retaliation.").

- 19 -

The Court agrees with Defendants that the complaint fails to allege the sort of "extreme and outrageous" conduct necessary to support an IIED claim under Arizona law. As Defendants correctly note, the statute of limitations confines Plaintiff's IIED claim to acts occurring after July 28, 2024. Thus, the claim may only be premised on the allegations that "[o]n August 16, 2024, Battalion Chief Rustin Eikleberry made derogatory and false statements about the Plaintiff's discrimination claim and his intentions at Station 41 in front of ten co-workers at dinner" and that "[o]n December 27, 2024, [Chris Murphy] used his access to Telestaff scheduling software to move firefighters around, moving his 'buddies' into better positions while disadvantaging Plaintiff." (Doc. 1-1 ¶¶ 66-67.) That conduct does not qualify as the sort of "extremely rare," "atrocious and utterly intolerable" conduct, *Mintz*, 905 P.2d at 563, that "completely violate[s] human dignity . . . [and] strike[s] to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung." *Pankratz*, 744 P.2d at 1189 (citation omitted). Courts have not hesitated to reject employment-related IIED claims under analogous circumstances. *See, e.g.*, *Mintz*, 905 P.2d at 563-64 (employer failed to promote the plaintiff, forced her to return to work, and informed her, via a letter delivered to her hospital bed where she was being treated for severe emotional problems, that her job duties had been reassigned); *Nelson v. Phoenix Resort Corp.*, 888 P.2d 1375, 1386 (Ariz. Ct. App. 1994) (employer used an armed security team to escort the plaintiff out of the premises in middle of night, allowed the plaintiff to use the bathroom on the way out only if accompanied into the stall by armed escorts, and fired the plaintiff in the lobby in front of coworkers and the media); *Pontikis v. Lucid USA Inc.*, 2023 WL 6127693, *3 (D. Ariz. 2023) ("Plaintiff sets forth the retaliatory acts which he alleges resulted in intentional infliction of emotional distress. They include: being passed up for a promotion, being publicly reprimanded, prohibiting one other Lucid employee from speaking with Plaintiff, making negative comments about him to other employees, expressing an intent to terminate Plaintiff to his co-employees, and ostracizing him from work-related conversations. To be sure, these allegations, which do amount to a retaliation claim, do not amount to a claim for the intentional infliction of emotional

distress as a matter of law."); *Reel Precision*, 2016 WL 4194533 at *3 (employer forced employees to perform a public "walk of shame" after failing to correctly perform their job responsibilities); *Henson v. Air Nat. Guard Air Force Rsrv. Command Test Ctr.*, 2007 WL 2903993, *12 (D. Ariz. 2007) (employer subjected plaintiff to an abusive five-hour long meeting, created an unpleasant work environment in which plaintiff was threatened that she would lose her job, and ignored several of plaintiff's requests for assistance).[5]

VI.    Punitive Damages

Defendants also move to dismiss Plaintiff's request for punitive damages. (Doc. 8 at 14-15.) Plaintiff does not respond. (*See generally* Doc. 10.)

Count Two-*Monell*, which has now been dismissed, is the only claim that included an express demand for punitive damages. (Doc. 1-1 ¶ 103.) However, Plaintiff's prayer for relief also appears to assert an undifferentiated claim for punitive damages. (*Id.* at 16.) Regardless, to the extent Plaintiff is seeking punitive damages based on his remaining claims against the City that have not been dismissed—Counts One, Two-Title VII, Three, and Four—the Court agrees with Defendants that punitive damages are unavailable.

As for Count One, although the Ninth Circuit has left open the question "[w]hether punitive damages are available at all under [§] 1981 where the defendant is a municipality," *White v. Washington Pub. Power Supply Sys.*, 692 F.2d 1286, 1290 (9th Cir. 1982), many district courts within this circuit have held that punitive damages are not available in this circumstance. *See, e.g.*, *Harvey v. City of San Diego*, 2009 WL 10671672, *3 (S.D. Cal. 2009) ("Nor are punitive damages available against municipalities under [§] 1981 . . . ."); *Henry v. Portland Dev. Comm'n*, 2007 WL 3125309, *22 (D. Or. 2007) ("[T]he law does not allow an assessment of punitive damages against a municipality in a [§] 1981 claim."); *Kaulia v. Cnty. of Maui*, 2006 WL 4660130, *6 (D. Haw. 2006) ("As to the Plaintiff's claim for punitive damages pursuant to § 1981, the Supreme Court has held that a municipality is immune from punitive damages under 42 U.S.C. § 1983, . . . and the Court's

---

[5]    This conclusion makes it unnecessary to address Defendants' arguments regarding the second IIED element.

rationale applies equally to § 1981 actions.") (cleaned up). *See also Walters v. City of Atlanta*, 803 F.2d 1135, 1148 (11th Cir. 1986) ("[T]he district court correctly disposed of Walters' [§ 1981-based] punitive damages claims against the City."); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1270 (7th Cir. 1984) (same); *Poolaw v. City of Anadarko, Okl.*, 738 F.2d 364, 367 (10th Cir. 1984) (same); *Heritage Homes of Attleboro, Inc. v. Seekonk Water Dist.*, 670 F.2d 1, 3 (1st Cir. 1982) (same). The Court is persuaded by these authorities and therefore concludes that Plaintiff may not seek punitive damages based on his § 1981 claim.

Plaintiff is also barred from seeking punitive damages against the City based on his remaining Title VII claims. "42 U.S.C. § 1981 a(b)(1) provides that a party may recover punitive damages under Title VII against any defendant 'other than a government, government agency, or political subdivision.'" *Reed v. City of Culver City*, 2020 WL 7315016, *4 (C.D. Cal. 2020). *See also Harvey*, 2009 WL 10671672 at *3 ("[P]unitive damages are not available against municipalities in Title VII claims.").

VII.    <u>Leave To Amend</u>

Defendants contend that Plaintiff's claims should be dismissed with prejudice and without leave to amend. (Doc. 8 at 7, 8, 9, 10, 14.) In his response, Plaintiff does not request leave to amend. (Doc. 10.) Nevertheless, the rule in the Ninth Circuit is that "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016).

The decision whether to grant leave to amend is governed by Rule 15(a) of the Federal Rules of Civil Procedure, which "advises the court that 'leave [to amend] shall be freely given when justice so requires.'" *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). "This policy is 'to be applied with extreme liberality.'" *Id.* (citation omitted). Thus, leave to amend should be granted unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946,

951 (9th Cir. 2006).  Applying that standard, leave to amend Count Two-*Monell* against Rideout is denied on futility grounds, as a *Monell* claim cannot be brought against an individual defendant.  The Court will, however, grant leave to amend as to Count Five and as to any punitive damage claim premised on Count Five.

Accordingly,

**IT IS ORDERED** that:

1.    Defendants' motion to dismiss (Doc. 8) is **granted in part and denied in part**.  The only claims being dismissed are Count Two-*Monell*, Count Five, and Plaintiff's request for punitive damages.

2.    Plaintiff may file a First Amended Complaint ("FAC") within 14 days of the issuance of this order.  Any changes shall be limited to attempting to rectify the deficiencies identified in this order as to which leave to amend was granted.  Plaintiff shall, consistent with LRCiv 15.1, attach a redlined version of the pleading as an exhibit.

3.    Rideout is dismissed as a defendant.

Dated this 9th day of March, 2026.

_____
Dominic W. Lanza
United States District Judge